889 F.2d 197
 1989 Copr.L.Dec. P 26,491, 12 U.S.P.Q.2d 1779
 HARPER HOUSE, INC., Plaintiff-Appellee-Cross-Appellant,
v.
THOMAS NELSON, INC.; Time Maker, Inc.; National Media
Group; R.M. Marketing, Inc.,
Defendants-Appellants-Cross-Appellees.
 Nos. 87-6398, 87-6411.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 26, 1989.
Decided Oct. 31, 1989.
 
 Joel McCabe Smith, Gary L. Swingle, Leopold, Petrich & Smith, Los Angeles, Cal., for defendant-appellant Thomas Nelson, Inc.
 Robert P. Taylor, Pillsbury, Madison & Sutro, San Francisco, Cal., for Pennsylvania defendants-appellants.
 Robert A. Schroeder, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., for plaintiff-appellee Harper House, Inc.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, Chief Judge, NELSON and BOOCHEVER, Circuit Judges.
 GOODWIN, Chief Judge:
 
 
 1
 Defendants appeal a judgment awarding damages for infringement of copyright and unfair competition, arising out of their production and marketing of an "organizer" that closely resembled the product of plaintiff Harper House, Inc.
 
 
 2
 Harper House's trial witness described organizers as products intended to help people deal with the tremendous amount of information that they must absorb in order to keep up in a modern, complex world. Harper House's organizers are supposed to aid memory, to help plan, and to help individuals to be more creative. The organizers' categories and formats suggest ways in which information should be stored and analyzed.
 
 
 3
 Defendants describe organizers in less grandiose terms. They contend that an organizer is a collection of blank forms for recording calendar information and often-used dates, addresses and telephone numbers. Typically, the blank forms are contained in a loose-leaf binder, with tabs to identify and separate the various sections. Additional forms and up-to-date calendars can later be inserted into the loose-leaf binder. Virtually all organizers contain calendars, telephone and address pages, and sections for recording daily activities. Other features of an organizer can vary widely, depending on information the designer considers most useful, the market for which the organizer is intended, and the format and graphic design chosen.
 
 
 4
 Harper House was established in 1980, and has grown to be a leading seller of organizers. It first produced "Day Runner" in 1982, and followed with "Running Mate," a smaller, more compact organizer, in 1984. These products were very successful, and Harper House's sales increased from $4 million in 1984 to $15 or $16 million in 1986. During the relevant period, Harper House's organizers sold at retail for $40 to $50 each.
 
 
 5
 On June 14, 1985, Harper House applied for and received certificates of registration from the Copyright Office for the 1982, 1983, and 1984 versions of Day Runner, and for the 1984 Running Mate. Under the section "Nature of Authorship," the applications for registration instructed Harper House to "briefly describe the nature of the material created by this author in which copyright is claimed." Harper House responded "[t]ext, compilation of data and editing of data."
 
 
 6
 Defendant Thomas Nelson, Inc. is a well-known Tennessee-based publisher, mostly of bibles and other items with religious themes. The other three defendants are R.M. Marketing, National Media Group, and Time Maker, Inc., all companies located in Pennsylvania and related to each other (referred to as the "Pennsylvania defendants"). R.M. Marketing and National Media Group are in the direct response marketing business. Time Maker, Inc. was formed in 1985 in order to sell the organizer developed by defendants.
 
 
 7
 Defendants decided to produce an organizer, eventually named the "Time Maker." They retained Meredith Baxter-Birney, star of the television series "Family Ties," to promote the organizer. They also hired Donna Otto to assist in designing the organizer. Donna Otto had presented numerous seminars on how women should organize their time. She was described in promotional literature as the "developer" of Time Maker, though her role may have been primarily promotional.
 
 
 8
 In fact, Donna Otto and the defendants did not design Time Maker from scratch. Much of Time Maker was based upon Harper House's organizers, which defendants had identified as the best organizers currently available. At a January 1985 meeting at which the defendants' project took shape, Mary Wheeler, the editor at Thomas Nelson in charge of the project, was told to have printed copies of Time Maker prototype available in three weeks. At trial, she testified that creation of an original work would have taken six months to a year.
 
 
 9
 Many of the blank forms for Time Maker were marked-up versions of forms contained in Harper House's organizers, with little or no change. On the other hand, Time Maker also contains many forms not copied or derived from Harper House's organizers. Notably, Time Maker includes many specialized forms for homemakers, such as a weekly menu planner and pre-printed grocery lists. Time Maker also has a binder very similar to that of Harper House's Running Mate, including pockets for business cards, a calculator, a note pad, and pens.
 
 
 10
 The Harper House organizers and the final version of Time Maker each contain at least several pages of instructional text. The prototype Time Maker does not contain any instructions. The organizers' instructions describe their features and proper use. The Time Maker instructions bear no apparent similarity to the Harper House instructions in their choice of words or their arrangement. All the Time Maker instructions are in a six-page section at the front of the organizer. Harper House's organizers each contain a general instructional page at the front, with additional instructions at the beginning of each section.
 
 
 11
 After the prototype Time Maker (the "Time Maker I") was printed, Thomas Nelson's president, Robert Wolgemuth, requested a legal opinion from an attorney specializing in copyright. The opinion advised that copyright registrations had not been issued to Harper House for the Harper House products. It cautioned that, if Harper House were to obtain a copyright registration, Thomas Nelson might be held liable for infringement. It further recommended that Thomas Nelson change all Time Maker pages similar to pages in Harper House's organizers, especially any which had been copied from Harper House.
 
 
 12
 Defendants proceeded to have printed 200 copies of Time Maker I. These were displayed in television and print advertisements, and distributed to salesmen to be shown to retailers in order to generate orders. Defense witnesses testified that the salesmen were told that there would be changes between the prototype and the production version.
 
 
 13
 A test commercial had been filmed in late January, 1985. Based on positive responses, a commercial for national display was filmed in June, 1985, using Time Maker I. Time Maker I was never sold to consumers, though it was pictured in the commercial and in print advertisements. The defendants made many changes from Time Maker I in readying the production version (the "Time Maker II"). The parties provided contrasting testimony regarding the significance of changes between Time Maker I and Time Maker II, as well as the care with which the changes were undertaken. Defendants testified that Time Maker I was featured in commercials and print advertisements because Time Maker II had not been completed as of the date for filming.
 
 
 14
 The Pennsylvania defendants began direct response marketing on or about July 1, 1985. The introductory price of Time Maker was $19.95. A few months later, Thomas Nelson began to distribute Time Maker to bookstores, where it sold for $24.95. Defendants spent $1,800,000 on advertising and made total sales of about $12,500,000. Nevertheless, they abandoned the organizer business in early 1986 after liquidating their existing inventories. Defendants argued that they lost money on Time Maker, and left the business for that reason. Harper House disputed this, pointing to the lack of adequate documentary support for the alleged losses, as well as the fact that Defendants paid only about $4 for each Time Maker, made in Taiwan and Korea, while selling them for $20 to $25 each. Harper House claimed that defendants "dumped" their inventory after being sued because they feared that further sales would be enjoined.
 
 
 15
 A Harper House representative saw Time Maker I at a trade show in May, 1985, and demanded that defendants stop infringing upon Harper House's copyrights. Defendants refused, and Harper House filed suit soon thereafter, alleging copyright infringement, violation of the Lanham Act, and state law unfair competition. Defendants responded by filing an unfair competition action against Harper House in Pennsylvania. Defendants' unfair competition action was transferred to the Central District of California where it was dismissed, and Harper House was awarded $54,848.60 in attorneys fees.
 
 
 16
 During discovery in this action, Thomas Nelson's president Wolgemuth stated that he did not know of records relating to the profitability of Time Maker, records allegedly kept for the purpose of dividing the profits among the defendants. After the accountant who had prepared those records testified as to their contents, and that he had delivered the records to Wolgemuth, the district court sanctioned Thomas Nelson $150,000.
 
 
 17
 A jury trial was held in May, 1987. The parties stipulated that the court would decide the issue of copyrightability. Defendants moved for a directed verdict on the grounds that Harper House's organizers were not copyrightable, that even if they were copyrightable defendants did not appropriate protectable subject matter, and that the unfair competition claims lacked foundation. The district court denied the motion and found Harper House's organizers copyrightable. That ruling was reaffirmed in a post-trial memorandum. The court instructed the jury simply that Harper House's organizers met the requirements of the Copyright Act and that they were "therefore not to be concerned with [the organizers'] copyrightability." The court refused to give defendants' proposed jury instructions that portions of the organizers were not protected by copyright.[1]
 
 
 18
 The jury found for Harper House on all claims. It awarded profits of $4,163,875 and damages of $1,873,932 under the copyright claim and damages of $1,860,307 under the Lanham Act claim. It found that all the Lanham Act damages were duplicative of the copyright damages.
 
 
 19
 Defendants moved for judgment notwithstanding the verdict and for a new trial. Harper House moved for entry of judgment in the sum of $13,178,225, the amount to which it would allegedly be entitled if the Lanham Act damages were held not duplicative, if those damages had been trebled, and if attorneys fees and prejudgment interest had been awarded. The district court denied these motions in a written opinion, and entered judgment against defendants, jointly and severally, for $6,037,807.
 
 1. Copyrightability
 
 20
 The district court concluded that Harper House's organizers were copyrightable. The court noted that Harper House obtained certificates of registration from the Copyright Office for its organizers, creating a presumption of copyrightability under 17 U.S.C. Sec. 410(c). Under section 410(c), the registrations are presumed to be valid and "[t]he evidentiary weight to be accorded the certificate of a registration ... shall be within the discretion of the court." The district court noted that this presumption "shifts the burden of proof to the defendants to demonstrate why plaintiff's organizers are not copyrightable." See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1019 (9th Cir.1985).
 
 
 21
 The district court reasoned that Harper House's organizers were copyrightable as compilations, that each organizer, "consisting of a unique selection, format, and combination of forms and information, clearly represents an original work of authorship." The court further noted that considerable "time and energy as well as thought went into producing new products designed to provide greater utility to the relevant consumer public. Such effort alone, expended to create tangible works of authorship, is within the scope of copyright protection." (citing Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 976 (9th Cir.1987)).[2]
 
 
 22
 Issues involving the availability and extent of copyright protection for Harper House's time management system present mixed questions of law and fact. See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir.1977). Where, as here, "the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, ... the question should be classified as one of law and reviewed de novo." United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 23
 Defendants argue that Harper House's organizers are not copyrightable. They argue (1) that as "useful articles," utilitarian aspects of the organizers are not copyrightable; (2) that blank forms and common property (such as address book pages and calendars) which make up the organizers are not copyrightable; and (3) that because of their functional selection and arrangement, Harper House organizers are not protectable "compilations."
 
 
 24
 (1) Utilitarian aspects of useful articles. In Fabrica Inc. v. El Dorado Corp., 697 F.2d 890 (9th Cir.1983), we discussed 17 U.S.C. Sec. 101, which declares that the utilitarian aspects of useful articles are not copyrightable. A useful article is one "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. Sec. 101. Further, in Fabrica, we interpreted this definition (adopted as part of the Copyright Act of 1976, effective January 1, 1978) as significantly narrowing the range of protectable works, revising both the standard set by the Supreme Court in Mazer v. Stein, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (allowing protection for nonutilitarian aspects of utilitarian items), and the regulations promulgated after Mazer. We noted:
 
 
 25
 The significant change from the prior law is that the courts need no longer determine whether an article's function is solely utilitarian. Now, if an article has any intrinsic utilitarian function, it can be denied copyright protection except to the extent that its artistic features can be identified separately and are capable of existing independently as a work of art.
 
 
 26
 Fabrica, 697 F.2d at 893.[3] We held that the plaintiff's carpet display folders (pictured at 697 F.2d 896-98) did not have artistic features that could be separated from their utilitarian function. The court noted that "there was no substantial evidence that the folders existed for any reason independent of their utilitarian function as advertising and marketing tools." Id. at 894.
 
 
 27
 Defendants cite the rejection by the House of Representatives of the proposed Title II of the Copyright Act of 1976, H.Rep. No. 1476, 94th Cong., 2d Sess. 50 (1976), U.S.Code Cong. & Admin.News, pp. 5659, 5663, as support for the proposition that useful articles are not entitled to copyright protection. Title II, as passed by the Senate and forwarded to the House, would have provided protection for the 'original ornamental design of a useful article'. S.B. No. 22, 94th Cong., 1st Sess., 122 Cong.Rec. 3856-59 (1976). The rejection of Title II was based upon concern that Title II might "create a new monopoly which has not been justified by showing that its benefits will outweigh the disadvantage of removing such designs from free public use." Id. Title II would have provided limited protection to useful articles for 10 years. Copyright, however, would provide Harper House's organizers 75 years of protection. 17 U.S.C. Sec. 302(c).
 
 
 28
 Harper House argues that this case is distinguishable from Fabrica because that case involved display folders analyzed as potential "pictorial, graphic and sculptural works" under 17 U.S.C. Sec. 102(a)(5). The "useful article" exception is intended to apply only to such works: it is included as an exception to the definition of "pictorial, graphic, and sculptural works" at section 101. Further, Harper House argues that Fabrica quotes legislative history indicating that the "useful article" exception is intended to focus on "industrial product[s]." 697 F.2d at 893.
 
 
 29
 Harper House claims that its organizers were registered as text, data, and compilation of data, "literary works" under 17 U.S.C. Sec. 102(a)(1), and that therefore the useful article exception does not apply. Harper House's organizers do contain text--the instructions, headings, and data--more properly considered a literary work than a pictorial, graphic, or sculptural work. The useful article exception therefore cannot apply to textual portions of the organizers.
 
 
 30
 On the other hand, at trial, Harper House's president explained the utilitarian aspects of many of the organizers' features: the special hinges, pockets to hold keys, coins and a calculator, and graph paper to allow users to write in their preferred size. These elements, as well as any utilitarian, nontextual aspects of the calendar pages, address/telephone pages, other blank forms, ruler, and note paper are not copyrightable. Paper for writing, even ruled paper, is a utilitarian object. Under Fabrica, the non-textual utilitarian features of Harper House's organizers are not subject to copyright protection.[4]
 
 
 31
 In finding Harper House's organizers protectable, the district court relied mainly on cases arising under the 1909 Copyright Act: Baldwin Cooke Co. v. Keith Clark, Inc., 383 F.Supp. 650 (N.D.Ill.) (executive planner copyrightable), aff'd, 505 F.2d 1250 (7th Cir.1974); Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East, 542 F.2d 1053 (9th Cir.1976) (account books containing instructions and advice on successful management copyrightable); Cash Dividend Check Corp. v. Davis, 247 F.2d 458 (9th Cir.1957) (check copyrightable). Defendants suggest that these cases should be reexamined in light of the 1976 Copyright Act and Fabrica.
 
 
 32
 We do not interpret Fabrica as bringing into question Edwin K. Williams & Co., Cash Dividend Check Corp., or Baldwin Cooke. Both Edwin K. Williams & Co. and Cash Dividend Check Corp. involved copyright of text with blank forms. Edwin K. Williams & Co. upheld the copyright because "the instructions and blank forms constituted an integrated work." 542 F.2d at 1061. Similarly, Cash Dividend Check Corp. involved a "work" consisting of a retail discount scheme whereby a consumer would fill blank spaces on a "check" with the requisite number of stamps. Once the check had been filled with stamps, it could be cashed for the amount of money written on its face. The "book" included "other descriptive material," 247 F.2d at 459, and the plaintiff did "not seek copyright alone over the check portion of the work or writing, nor [did] it seek a copyright over its stamp plan. Rather, it [sought] a copyright over the writing, with the integrated check, which describes the means by which the stampcheck plan is carried out." Id. at 460. The 1976 Copyright Act's useful article rule does not affect the copyrightability of an integrated work of text and blank forms, but only that of pictorial, graphic, or sculptural works.
 
 
 33
 Baldwin Cooke presents perhaps the work most similar to Harper House's organizers. The executive planners at issue in that case included
 
 
 34
 a personal data page; a planning calendar for the current year; a diary calendar for the current year, the form of which was intended to allow the recording of various data and information; a planning calendar for the subsequent year; a holiday list for the current year; a monthly expense summary sheet; an expense summary form for the current year; a Zodiac birthday and anniversary information page; a postal information section; weights and measures information; a table setting forth decimal equivalents; pages for the recording of information concerning quarterly income, securities transactions, capital gains and losses and stock dividends; a page with three whole tabular calendars for the preceding, current and subsequent years and a section for the recording of names, addresses and telephone numbers.
 
 
 35
 383 F.Supp. at 653-54. Moreover, both the original and copied planners included artwork in the form of woodcuts on the outer corners of the pages. The court noted that a copyrightable compilation could consist entirely of matter which is not itself copyrightable. Id. at 654-55. The court held that the executive planner was held copyrightable as a compilation of data, relying heavily on the existence of certificates of copyright issued over the years 1963 to 1973. Under the Copyright Act of 1976, no matter how "useful" such a compilation of data might be, it is not pictorial, graphic, or sculptural work, and is therefore not within the useful article rule.
 
 
 36
 (2) Blank forms and common property. The Copyright Office has a longstanding regulation against copyright of blank forms "which are designed for recording information and do not in themselves convey information." 37 C.F.R. Sec. 202.1(c). This rule codifies the doctrine first enunciated in Baker v. Selden, 101 U.S. (11 Otto) 99, 107, 25 L.Ed. 841 (1879) ("blank account-books are not the subject of copyright"). Courts have held that forms similar to those making up much of the Harper House organizers are not copyrightable. See, e.g., Januz Marketing Communications, Inc. v. Doubleday & Co., 569 F.Supp. 76 (S.D.N.Y.1982). The "blank forms rule" would apply to many of the forms in Harper House's organizers.
 
 
 37
 Furthermore, copyright protection does not extend to common property such as standard calendars and area code maps. 37 C.F.R. Sec. 202.1(d). As the Copyright Office explains, copyright is not available in:
 
 
 38
 works consisting entirely of information that is common property containing no original authorship; for example, standard calendars, height and weight charts, tape measures and rulers, schedules of sporting events, and lists or tables taken from public documents or other common sources.
 
 
 39
 Copyright Office, Circular R-32, Blank Forms and Other Works Not Protected by Copyright, November 1984.
 
 
 40
 Defendants point out that much of the "literary work" contained in their organizers--the instructions and headings--bears no resemblance to that of Harper House's products. They argue that the copied portions consist entirely of (1) utilitarian features, (2) blank forms, and (3) common property (such as the calendars and area code/time zone map).[5] We agree that the blank forms and common property contained in Harper House's organizers are not copyrightable.
 
 
 41
 (3) Organizers as "compilations." In finding that Harper House's organizers were "original work[s] of authorship," the district court stated that the organizers consist of "a unique selection, format, and combination of forms and information."
 
 
 42
 A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.
 
 
 43
 17 U.S.C. Sec. 101 (emphasis added). Harper House argues that even if common property contained in the organizers and the individual blank forms are not copyrightable, the organizer as a whole is copyrightable as a compilation.
 
 
 44
 Defendants respond that the organizers' functional and utilitarian arrangement prevents them from being copyrightable even as compilations. While many of the elements making up the organizers may not be copyrightable in and of themselves, the unique "selection, coordination, or arrangement" of such elements, in combination with copyrightable elements such as the text of the instructions, is copyrightable as a compilation.
 
 
 45
 We agree that Harper House's organizers are copyrightable as compilations. Apple Barrel Prods. v. Beard, 730 F.2d 384, 387-88 (5th Cir.1984) demonstrates the compilation theory. That case involved the plaintiff's original expression of the idea of a country music show performed by children. Defendants were parents of the children performers. Unhappy with the plaintiffs who had developed the show, the defendants took their children and started another, similar show. Plaintiffs claimed the new show infringed its copyright as to the manner of presentation of the songs and dances. The district court ruled in favor of the defendants because it found that the various parts of the shows (costumes, hay bales, American flags), when dissected, were not copyrightable. The Fifth Circuit reversed, with the direction that the show might still be copyrightable as a compilation, even if the individual elements could not be protected. We agree with this approach. A copyrightable compilation can consist mainly or entirely of uncopyrightable elements.
 
 
 46
 The Copyright Office determined that Harper House's organizers are copyrightable. At trial, Harper House witnesses testified about the effort that went into creating the organizers: into selecting, coordinating, and arranging their elements. The district court accepted this testimony as sufficient to demonstrate that an original work had been created. We accept the district court's finding and reject defendants arguments that Harper House's organizers are not copyrightable as compilations.
 
 
 47
 Even if an organizer is copyrightable as a compilation, however, it warrants only extremely limited copyright protection. A factual compilation receives only limited copyright protection. See Worth v. Selchow & Righter Co., 827 F.2d 569, 573 (9th Cir.1987); Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 492 (9th Cir.1985). Similarly, compilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations consisting largely of uncopyrightable elements should not be found in the absence of "bodily appropriation of expression." 827 F.2d at 573. Such a standard would be in keeping with cases relied on by the district court involving similar items. Baldwin Cooke, Edwin K. Williams & Co., and Cash Dividend Check Corp., each involved "bodily appropriation"--copying or unauthorized use of substantially the entire item. In Baldwin Cooke, the defendant included exactly the same forms as found in plaintiff's planner, and advertised its planner as meeting demands for a product such as plaintiff's planner. Both planners were 140 pages long, and the layout, organization, artwork and lists were identical. 383 F.Supp. at 656. In Edwin K. Williams & Co., the defendant was a corporation related to plaintiff which used plaintiff's entire work in an unauthorized manner. 542 F.2d at 1055-59.
 
 
 48
 Defendants argue that they did not bodily appropriate or identically copy the selection and arrangement of the Harper House organizers. Both versions of Time Maker had many sections not included in the Harper House organizers, and the similar (copied) sections serve basic functions common to most organizers. And unlike Edwin K. Williams & Co. and Cash Dividend Check Corp., the copied portion did not involve extensive instructions or text. These arguments are best addressed in the context of the jury instructions, discussed below.
 
 
 49
 (4) Copyrightability: Conclusion. The Copyright Office issued certificates of registration for Harper House's organizers, and the district court found that the organizers were copyrightable compilations. We agree with this finding. As copyrightable compilations, the organizers' selection, coordination, and arrangement are protectable. The text of the instructions is also protectable. Nevertheless, the blank forms and common property contained within the organizers are excluded from protection. Non-textual utilitarian elements of the design such as the binder, pockets, ruler, and blank or ruled paper are also excluded from protection by the "useful article" rule.
 
 
 50
 As compilations consisting largely of uncopyrightable elements, the organizers should be afforded only limited protection.
 
 2. Copyright Jury Instructions
 
 51
 Defendants argue that, in its jury instructions, the district court did not attempt to distinguish between parts of the Harper House organizers which are not copyrightable, and the organizer itself as a copyrightable compilation. The district court rejected this argument in its memorandum of decision.
 
 
 52
 In reviewing jury instructions to which timely objections have been made, this court determines "whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to ensure that the jury fully understood the issues." Los Angeles Memorial Coliseum Comm'n v. National Football League, 726 F.2d 1381, 1398 (9th Cir.), cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).
 
 
 53
 Defendants claim that, because their employees had testified that they had copied certain unprotectable aspects of Harper House's organizers, and because the jury was not instructed that these aspects were not protectable in and of themselves, the jury had no choice but to return a verdict of infringement. The court's Instruction No. 5 told the jury that it need not be concerned with the organizers' copyrightability. Instruction Nos. 6 and 7 stated that infringement can be proved by direct proof of copying.
 
 
 54
 Defendants' proposed instructions on unprotectable material were rejected by the court. They provide, in part:
 
 
 55
 Blank forms which are designed for the recording of information are not copyrightable. If you find that Plaintiff's organizers contain forms meant to record information such as graph paper, diary forms, address forms, expense forms and the like, such forms are excluded from copyright protection. Likewise, many of the forms which were referred to contained common property such as calendars, time zones, telephone area codes, measuring rulers, calorie counter charts, and check registers. Such common property is not copyrightable.
 
 
 56
 Defendants' Proposed Jury Instruction No. 5.
 
 
 57
 Defendants' proposed jury instruction regarding the organizer as a compilation, also rejected by the court, would have cautioned the jury:
 
 
 58
 One basis upon which Plaintiff claims copyright protection for its organizer is as a compilation. Under the copyright laws, a compilation is a work resulting from a process of selecting, bringing together, organizing, and arranging previously existing material from other sources, regardless of whether the individual items in the material have been or ever could have been subject to copyright. Such selection or arrangement may in itself constitute an original contribution of authorship and should be protectable against appropriation under copyright principles. However, the fact that an author has made such an original contribution is not a basis for protecting the pre-existing materials if the original selection or arrangement is not copied.
 
 
 59
 Defendants' Proposed Jury Instruction No. 6.
 
 
 60
 The court's Instruction No. 9 invited the jury to consider the works as a whole, possibly leading the jury to focus on whether the two "books" look alike, not on whether defendants copied protectable expression, be that protectable expression the text contained in the organizer or the selection and arrangement of the compilation. Instruction No. 9 states:
 
 
 61
 You should ask yourself whether the ordinary reasonable person would find the total impact and effect of Defendants' work substantially similar to Plaintiff's work....
 
 
 62
 In comparing Plaintiff's and Defendants' organizers to determine whether there has been copyright infringement, you must consider and compare the contents of each of the works as a whole. That is, you must not simply focus on isolated elements of each work to the exclusion of the other elements, combination of elements and expressions therein.
 
 
 63
 As a preliminary matter, we consider Harper House's argument that defendants failed to make the relevant objections to the court's jury instructions and have therefore waived any such objection. Fed.R.Civ.P. 51.
 
 
 64
 First, defendants specifically objected to Instruction Nos. 4 and 9. They claimed that Instruction No. 4 should not have included "coordination" or "method of statement" as protectable elements. In its post-trial memorandum, the district court mistakenly found that defendants had waived an objection to the use of the phrase "method of statement" in Instruction No. 4. Instruction No. 4, however, is not crucial to defendants' argument on appeal.
 
 
 65
 Defendants then made a vague objection to Instruction No. 9, or, to quote verbatim, "Number 6, Number 9--Number 9 for two reasons." After being told by the court to state objections in "synopsis form," counsel said "we do not want to concede that the copyrights are valid.... And again, the ripple effect on the protectable element, the substantial similarity." Counsel stated that the "ripple effect" involved "a number of [the instructions]."
 
 
 66
 Defense counsel continued, raising the concern that the jury would be confused because defendants had argued throughout trial that portions of the organizers were not copyrightable, but the instructions said nothing about that issue. The court stated that it was simply instructing the jury that the organizers were copyrightable, without elaboration, because it assumed that defendants preferred not to draw the jury's attention to the fact that the court had ruled against defendants on that question. The court was aware of defendants' position on copyrightability, especially their position regarding non-copyrightable elements of the organizers, but the court had previously rejected that position. Further, while the post-trial memorandum found that defendants had waived objection to the use of the phrase "method of statement" in Instruction No. 4, the court addressed on the merits defendants' arguments that the jury instructions failed to focus the jury's attention on protectable elements of Harper House's organizers. The court did not understand defendants to have waived such an argument.
 
 
 67
 The failure to object may be disregarded if the party's position has previously been clearly made to the court and it is plain that further objection would be unavailing. Brown v. AVEMCO Inv. Corp., 603 F.2d 1367, 1370-73 (9th Cir.1979); see generally Wright & Miller, Federal Practice and Procedure Sec. 2553, at 639-40 (1971). Given the pre-trial briefing on the issue of copyrightability, the defendants' discussion of uncopyrightable elements during argument for a directed verdict, the court's refusal to give defendants' proposed instructions, and the argument regarding the jury instructions, defendants' vague objection to Instruction No. 9 adequately preserves the issue for appeal. We must therefore consider whether the court's instructions ensured that the jury fully understood the issues.
 
 
 68
 Defendants argue that Instruction No. 9, given without their proposed cautionary instructions, encouraged the jury to put the two articles next to each other and determine whether they looked alike, not whether defendants copied protectable expression. In closing argument, counsel for Harper House asked the jury to do as much. Harper House suggests Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir.1977), as the basis for Instruction No. 9's "total impact and effect" test. In Cooling Systems, 777 F.2d at 492-93, we considered such a test improper where the work at issue, a catalog of automobile radiators, contained little protectable expression. This case is analogous to Cooling Systems. The highly subjective "total impact and effect" test of Instruction No. 9 was insufficient, particularly in light of the district court's refusal to give the Defendants' proposed instructions regarding unprotectable elements of the organizers.
 
 
 69
 We reject Harper House's claim that Instruction Nos. 6 and 8 adequately cautioned the jury to limit its review to protectable material. Instruction Nos. 6 and 8 both required that Harper House make a showing of "substantial similarity" between "protectable expressions " in the organizers. Though the instructions cautioned that the jury limit its review to protectable material, this caution was of little value because these instructions did not adequately explain to the jury which material was, in fact, protectable. In a case such as this, given the negative connotations to "copying," there was an obvious risk of an improper verdict for plaintiffs, and a need for further instructions to protect legitimate activity and avoid the suffocation of competition.[6]
 
 
 70
 Given the extremely limited protection that Harper House's organizers receive, the jury instructions covering copyright infringement liability did not adequately distinguish between protectable and unprotectable material. The jury was not told that blank forms, common property, or utilitarian aspects of useful items are not protectable, and they may have found that defendants infringed Harper House's copyright based upon the direct copying of such unprotected material, not based upon copying of the selection, coordination, or arrangement of Harper House's organizers.
 
 
 71
 We hold that, viewing the jury instructions as a whole, the trial court's instructions on copyrightability were not adequate to ensure that the jury fully understood the issues, and therefore constituted error requiring a new trial on the liability and damages phase of the infringement claim.
 
 3. Lanham Act Claims
 
 72
 Defendants challenge the sufficiency of the evidence to sustain the jury's finding that defendants violated Lanham Act Sec. 43(a), 15 U.S.C. Sec. 1125(a) (1982). In reviewing the jury verdict on this claim, we must determine whether the verdict is supported by substantial evidence, that is, such relevant evidence as reasonable minds might accept as adequate to support the verdict. Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1013-14 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).
 
 
 73
 To prevail on a claim under section 43(a) of the Lanham Act, a plaintiff must show:
 
 
 74
 (1) that defendants attempted to sell their organizers by making false or deceptive advertisements and representations to customers;
 
 
 75
 (2) that defendants' false and deceptive representations and advertisements actually deceived a significant portion of the consuming public;
 
 
 76
 (3) that plaintiff was injured by defendants' conduct.
 
 
 77
 See U-Haul Int'l, Inc. v. Jartran, Inc., 601 F.Supp. 1140, 1149-50 (D.Ariz.1984), aff'd in part, rev'd in part on other grounds, 793 F.2d 1034 (9th Cir.1986); Toro Co. v. Textron, Inc., 499 F.Supp. 241, 251 (D.Del.1980). The district court upheld the jury's Lanham Act verdict, finding that, construing the evidence in a light most favorable to Harper House, a reasonable jury could have found the requisite elements.
 
 
 78
 The most common section 43(a) false advertising case involves one competitor suing another, claiming that the defendant attempted to pass off (or "palm off") its goods as those of the plaintiff. See generally 2J. Thomas McCarthy, Trademarks and Unfair Competition Sec. 27:8 (2d ed. 1984). Here, Harper House could not show that the defendants attempted to palm off their products as those of Harper House. Instead, Harper House claimed that defendants deceived consumers by showing Time Maker I in its promotion and advertisements and then selling Time Maker II. The district court held that this "unusual" theory should not prevent recovery, so long as the requisite elements of section 43(a) are established. We have refused to limit section 43(a) to claims of palming off products. U-Haul Int'l, Inc. v. Jartran, Inc., 681 F.2d 1159, 1162 (9th Cir.1982) ("Jartran I ") (section 43(a) claim can also be applied to deceptive comparative advertising). We examine each of the Lanham Act Sec. 43(a) elements.
 
 
 79
 (1) False or deceptive advertisements. Harper House presented evidence of deceptive advertisements. Defendants admitted that Time Maker I had been used in advertising and promotion, although Time Maker II was delivered to consumers who ordered in response to the advertisements. There are minor differences between the two versions, including many revised forms and one form shown in advertisements that was not included in the version actually sold. Consumers received a slightly different product than had been advertised. Defendants' salespersons also showed Time Maker I to distributors and retailers, although defendants claim that the salepersons were advised that Time Maker I was merely a prototype and that the final version would be slightly different.
 
 
 80
 (2) Deception of a significant portion of the consuming public. No actual evidence was presented that defendants' advertising deceived a significant portion of the consuming public. No one complained about or returned Time Maker II because of the minor differences from Time Maker I. Instead, the court upheld the jury's finding based on the presumption that:
 
 
 81
 [t]he expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that the consumers are, in fact, being deceived.
 
 
 82
 U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1041 (9th Cir.1986) (Jartran II ). The relevant jury instruction correctly followed Jartran II: it stated that in order for this presumption to apply, the jury must find that defendants engaged in intentional deception. In Jartran II, the defendants argued that the presumption of consumer deception should be limited to palming off cases, and should not be applicable to cases of comparative advertising. The court rejected that argument. Id.
 
 
 83
 This case differs somewhat from Jartran II, because it involves not a deceptive comparison of plaintiff's and defendants' products, but deception regarding defendants' product with little overt reference to plaintiff or plaintiff's product.[7] Nevertheless, the presumption that consumers were, in fact, deceived into purchasing a product different than that advertised is no less or more justified, and we will not require actual evidence that consumers were deceived.
 
 
 84
 (3) Injury caused by defendants' deceptive advertising. The district court held that "the jury could reasonably find that plaintiff was injured." Yet, the court did not refer to any proof of injury. Instead, it relied on a second presumption from Jartran II, a presumption that a plaintiff's damages equal the amount of money spent by defendants on advertising.[8] The court apparently presumed that plaintiff had been injured. The presumption of damages in the amount defendants spent on advertising is not, however, a presumption of the fact of injury. Courts distinguish between the amount of proof needed to show that some damages were the certain result of a section 43(a) violation and the amount of proof needed to ascertain the exact amount of damage. Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 745 (7th Cir.1985).
 
 
 85
 The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages.... However, the plaintiff may not recover if he fails to prove that the defendant's actions caused the claimed harm.
 
 
 86
 Id. (citations omitted).
 
 
 87
 In Jartran II, the plaintiffs had presented evidence of injury from Jartran's deceptive advertising, evidence the district court considered sufficient to support a $40 million damage award based upon either the actual evidence of injury (with punitive damages added) or the presumption of damage in the amount of the defendant's advertising cost and the cost of corrective advertising. Jartran II, 793 F.2d at 1037.
 
 
 88
 Here, as defendants argue, Harper House presented no evidence of any injury causally related to the defendants' deception. The district court noted that "there is no evidence of lost profits by the plaintiff." As noted above, there was no actual evidence that consumers were deceived. If, in fact, consumers were deceived, the deception likely had little or no causal connection with any damage Harper House might have suffered from defendants' advertising or selling their organizer. A Harper House witness did testify that some retailers thought Time Maker might be a Harper House product, and that he had to explain to them that it was not. The district court itself acknowledged that this evidence of confusion was "insubstantial." Furthermore, evidence that consumers confused Time Maker I (or Time Maker II) with Harper House products would support a palming off theory. The plaintiffs lacked sufficient evidence to pursue such a theory. Any injury resulting from such alleged palming off would be different from injury caused by defendants advertising a better product than they sold.
 
 
 89
 Of course, because of the possibility that a competitor may suffer future injury, as well as the additional rationale underlying section 43(a)--consumer protection--a competitor need not prove injury when suing to enjoin conduct that violates section 43(a). See Johnson & Johnson v. Carter Wallace, Inc., 631 F.2d 186, 191 (2d Cir.1980). See generally 2 J. Thomas McCarthy, Trademarks and Unfair Competition Secs. 27:4, 27:5 (2d ed. 1984). Such an injunction will protect the interests of both competitors and consumers.
 
 
 90
 In a suit for damages under section 43(a), however, actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case. We agree with the district court that Harper House failed to present any evidence of injury resulting from defendants' deception. The district court should have granted defendants' motion for judgment notwithstanding the verdict on the unfair competition claims.
 
 
 91
 Because we reverse both the copyright and unfair competition judgments, we need not address any of the arguments raised by Harper House's cross-appeal.
 
 
 92
 REVERSED and REMANDED.
 
 
 
 [1]
 The court also refused to give a jury instruction on plaintiff's claim of state law unfair competition, noting that the Lanham Act claim provided a more generous standard of liability and recovery, and that Harper House had not presented a prima facie case of state law unfair competition. Harper House did claim that it would be entitled to punitive damages under California unfair competition law, damages not recoverable under the Lanham Act. We need not address the availability of punitive damages under California unfair competition law, however, because we reverse the Lanham Act judgment, and we agree with the district court that Harper House did not present a prima facie case of state law unfair competition
 
 
 [2]
 The defendants argue that "sweat of the brow" cannot bestow copyright protection on otherwise uncopyrightable work. We agree that the amount of work put into designing Harper House's organizers does not resolve the original question of copyrightability. The organizers meet the requirements of the Copyright Act
 
 
 [3]
 Harper House disputes whether the Copyright Act of 1976 was intended to revise the previous standard, citing Brandir International, Inc. v. Cascade Pacific Lumber Co., 834 F.2d 1142, 1147 (2d Cir.1987). Nevertheless, we are bound by Fabrica, this circuit's previous interpretation of the 1976 Act's "useful article" rule
 
 
 [4]
 The non-textual elements of the organizer (binder, ruler, pockets, hinges, graphic design of the blank forms, and other similar items) would seem to be a compilation of "two-dimensional and three-dimensional ... graphic, and applied art, ... maps, ... charts, ... [and] diagrams:" pictorial, graphic and sculptural work as defined at 17 U.S.C. Sec. 101, not literary work. Such pictorial, graphic and sculptural elements come within the useful article exception and are not copyrightable in and of themselves
 
 
 [5]
 For example, the area code/time zone map allegedly copied by defendants appears identical to that contained in most telephone directories and address books. The calendars are in standard formats, with no special features or artwork
 
 
 [6]
 In closing argument, Harper House's counsel fully exploited the negative connotation to copying, urging the jury to use their basic sense that when given a homework assignment at school, one should not copy the work of another student--"change a word here, change a word there, put it on a different size paper and hand it in as your own."
 
 
 [7]
 There was a direct comparison of Time Maker and Harper House's Running Mate at the Thomas Nelson Sales Conference, but defendants claim that the salespersons were told that the final version of TIME MAKER would be different, and were not misled. The television and print advertisements do not mention Harper House's products directly, stating only that Time Maker cost less than "similar organizers" and contained many additional forms
 
 
 [8]
 The Ninth Circuit accepts surrogate measures of damages in cases of palming off, see Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117 (9th Cir.1968) (defendant's profit used as measure of damage in face of plaintiff's inability to prove diversion of sales because of "palming off"), and similar measures have been used in cases of deceptive comparative advertising, Jartran II, 793 F.2d at 1041 (award of cost of Jartran's advertising plus cost of U-Haul's corrective advertising). The awards are intended as crude measures of damage to plaintiff's good will. See Comment, Money Damages and Corrective Advertising: An Economic Analysis, 55 U.Chi.L.Rev. 629 (1988). Although these are crude measures, in cases of "palming off" or direct comparative advertising, the presumption that plaintiff's good will has suffered significant damages seems justified. On the other hand, even if consumers are likely to suffer injury from a defendant's deception about its own product, when advertising does not directly compare defendant's and plaintiff's products, when numerous competitors participate in a market, or when the products are aimed at different market segments, injury to a particular competitor may be a small fraction of the defendant's sales, profits, or advertising expenses. Of course, large, presumptive damage awards are improper in a situation where injury is likely to be slight
 Here, defendants have not challenged the jury instructions regarding damage calculation under section 43(a). We leave to the future the question of how damages should be calculated in a section 43(a) claim that a defendant advertised a different (and allegedly better) product than they delivered.