**SKINDER–STRAUSS ASSOCIATES,**
Plaintiff,

v.

**MASSACHUSETTS CONTINUING LEGAL EDUCATION, INC.,**
Defendant.

**Civ. A. No. 94–10868–PBS.**

United States District Court,
D. Massachusetts.

Dec. 27, 1995.

**13.** *Id.* at *34.

Ian Crawford, Douglas W. Salvesen, J. Owen Todd, Todd & Weld, Boston, MA, for Plaintiffs.

Howard J. Castleman, Paul B. Galvani, Ropes & Gray, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Plaintiff, Skinder–Strauss Associates ("Skinder–Strauss") brings this action against Defendant, Massachusetts Continuing Legal Education, Inc. ("MCLE") for copyright infringement and unfair and deceptive trade practices arising out of the publication of competing legal directories.[1] Specifically, Skinder–Strauss alleges that MCLE's 1994 Massachusetts Legal Directory unlawfully copied protected material from its 1993 Massachusetts Lawyers Diary and Manual. Because of its red cover, Skinder–Strauss's publication is commonly known as the "Red Book." Similarly, MCLE's Legal Directory derives its appellation, "Blue Book," from the color of its cover. Both parties have moved for summary judgment as to all counts of the complaint. (Docket Nos. 24 & 32).[2] After a review of the directories, the Court concludes that the battle of the Red Book versus the Blue Book cannot be resolved on summary judgment because ordinary, reasonable people might well differ on whether the works as a whole are substantially similar. Accordingly, the Court *DENIES* Skinder–Strauss' motion in its entirety, and *ALLOWS* MCLE's motion only with respect to Counts I and III.

---

1. The Complaint includes the following: (1) copyright infringement in violation of 28 U.S.C. § 1338 (Counts I–III); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count IV); (3) unfair and deceptive trade practices in violation of M.G.L. c. 93A (Count V); and (4) common law unfair competition (Count VI). Count IV was waived. Count VI was neither briefed nor argued to this Court on summary judgment and therefore is deemed waived.

2. MCLE's motion was filed as a motion for judgment on the pleadings, or, in the alternative, for summary judgment. Because the motion is accompanied by affidavits and exhibits, however, it is considered a motion for summary judgment. *See* Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"); *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 835 (7th Cir.) (converting Rule 12(c) motion to one for summary judgment when movant relied on two affidavits in support of pleading), *cert. denied,* —— U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994).

## II. *Factual Background*

### 1. *Skinder–Strauss*

Skinder–Strauss, a general partnership organized under the laws of New Jersey, publishes legal directories in six states, including Massachusetts. The Red Book is a compilation of information, including a directory of attorneys, daily planner, calendar, and reference guide, intended to be useful to attorneys in Massachusetts and elsewhere. In various forms, Skinder–Strauss has published the Red Book since 1959, and it appears to be updated annually. Krivitzky Aff. ¶ 2.[3] The 1993 edition of the Red Book is at issue in this action. Skinder–Strauss received a registration certificate for the 1993 Red Book from the U.S. Copyright Office on December 18, 1992. Krivitzky Aff.Ex. A.

### 2. *MCLE*

MCLE is a non-profit corporation sponsored by the Massachusetts and Boston Bar Associations for the purpose of providing continuing legal education to Massachusetts attorneys. In the years following MCLE's inception in 1969, Skinder–Strauss permitted MCLE to use its listings of Massachusetts attorneys to assist the then-fledgling organization's marketing efforts. Krivitzky Aff. ¶ 27. In 1987, MCLE began building its own database for use in direct-mail marketing of its services. Since that time, MCLE has added to its database by drawing from several sources, including various legal publications, the Massachusetts Bar Association, and lists of newly-admitted attorneys published semiannually by the Massachusetts Board of Bar Examiners ("BBE"). MCLE also used the Red Book as one of the sources from which it gathered attorney information for its database. Reilly Aff. ¶ 8.

In 1993, MCLE published its own lawyers' desk reference, the 1994 Blue Book, which includes much of the same information contained in the 1993 Red Book. It drew from its database to generate a listing of Massa-

chusetts attorneys and verified its list through comparison to telephone "white pages" directories, confirmatory mailings to attorneys and other methods. In deciding which features should be included in the Blue Book, MCLE staff had focus groups which compared legal directories in use throughout the United States, including the Red Book. Reilly Aff. ¶ 11–12, Ex. C. Data on federal and state courts, agencies, and other useful information were compiled from several sources, among which were MCLE's database, national judicial directories, and the Red Book. *Id.* at ¶ 13–18.

### 3. *Section-by-Section Comparison*

To aid the Court's inquiry, a brief section-by-section description and comparison of the two volumes is useful. Each volume is subdivided into major categories of information, including blank forms for recording information, calendars of various kinds, directories of attorneys and judges, listings of state and federal agencies, and a variety of other information generally useful to practitioners. The Court's review of the two volumes resulted in the chart appended to this opinion as Attachment A. This chart is designed to be a rough grouping and comparison of information contained in the two works. As the chart demonstrates, the volumes share many of the same elements but differ in some respects.

### III. *Discussion*

#### A. *Summary Judgment*

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of

**3.** MCLE has filed a motion (Docket No. 39) to strike the Krivitzky affidavit as unsupported by the affiant's personal knowledge. While the Court recognizes that portions of the affidavit are mere conclusory allegations copied almost verbatim from the plaintiff's pleadings, other portions are based on Mr. Krivitzky's knowledge as the managing director of Skinder–Strauss. To the extent that the affidavit makes inadmissible statements, the Court will disregard them in considering the motions for summary judgment.

evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

■ These standards do not differ where, as here, both parties have moved for summary judgment. "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Dan Barclay, Inc. v. Stewart & Stevenson Serv., Inc.,* 761 F.Supp. 194, 197–98 (D.Mass.1991) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (1983)). The Court may not resolve genuine issues of material fact on cross-motions for summary judgment. *See Boston Five Cents Savings Bank v. Department of Housing and Urban Development,* 768 F.2d 5, 11–12 (1st Cir.1985) (noting difference between cross-motions for summary judgment and decision on stipulated record).

### B. *Copyright Infringement Claims*

It is not disputed that MCLE used the Red Book as one of the sources from which it gathered information for its Blue Book. However, Skinder–Strauss maintains, and MCLE disputes, that MCLE's use of the Red Book goes beyond mere reference but rather constitutes wholesale theft of the Red Book's purportedly unique selection of categories, data, and format. The extent to which the 1994 Blue Book is modelled after, and appropriates from, the 1993 Red Book is the central issue in this litigation.

Skinder–Strauss alleges that MCLE infringed its copyright in several ways. First, it claims that MCLE copied the selection, coordination and arrangement of data compiled in each of the individual features in the Red Book. Count I. Second, Skinder–Strauss alleges that MCLE copied the selection, coordination, and arrangement of materials by incorporating the structure of the Red Book as a whole into the Blue Book. Count II. Skinder–Strauss further claims that the Blue Book is a derivative work of the Red Book because MCLE published "what amount to mere editorial revisions" of certain allegedly copyrighted elements of the Red Book in its Blue Book. Count III.

■ "To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *see also Lotus Development Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 813 (1st Cir.1995) (applying test in copyright infringement action involving copying of computer software operating instructions), *cert. granted,* —— U.S. ——, 116 S.Ct. 39, 132 L.Ed.2d 921 (1995); *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 605 (1st Cir.1988) ("A party must show two elements to prevail on a claim of copyright infringement: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer").

■ If ownership of a valid copyright in the work as a whole is demonstrated, actionable copying must then be shown. In practice, this question involves a second two-step inquiry. First, the plaintiff must demonstrate that the material alleged to have been copied is itself copyrightable (i.e., sufficiently

original to warrant copyright protection). *See Feist*, 499 U.S. at 361, 111 S.Ct. at 1295–96. Second, he must prove actionable copying, usually via a showing of substantial similarity between the original work and the infringing work. *See Concrete Machinery*, 843 F.2d at 606. MCLE contends that Skinder–Strauss has not satisfied either part of this inquiry.

### 1. *Step One: Copyrightability*

■ "The sine qua non of copyright is originality." *Feist*, 499 U.S. at 361, 111 S.Ct. at 1295–96. For this reason, facts themselves are not subject to copyright. "The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Id.* at 347, 111 S.Ct. at 1288. Thus, factual information such as the listings of telephone subscribers in a given service area is not copyrightable. *Id.* at 361, 111 S.Ct. at 1295–96; *see also Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556–57, 105 S.Ct. 2218, 2228–29, 85 L.Ed.2d 588 (1985) (holding that President Ford could not copyright historical facts from his autobiography).

■ However, "it is beyond dispute that compilations of facts are within the subject matter of copyright." *Feist*, 499 U.S. at 345, 111 S.Ct. at 1287. The Copyright Act of 1976, 17 U.S.C. § 101, defines a copyrightable compilation as "a work formed by the collection and assembly of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." Section 103 of that title further provides that "the subject matter of copyright ... includes compilations." 17 U.S.C. § 103.

As the *Feist* Court explained:

Factual compilations ... may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail *a minimal degree of creativity*, are sufficiently original that Congress may protect such compilations through the copyright laws. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.

499 U.S. at 348, 111 S.Ct. at 1289 (emphasis added) (internal citation omitted). This form of copyright protection inheres not in the information presented but in the process and criteria by which data are selected. *See Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509, 513 (2d Cir.1991) ("Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation.").

In *Feist*, the Court held that Rural Telephone Service Company's (Rural) white pages listings were insufficiently creative to trigger this protection. As required by the terms of its state-granted monopoly, Rural simply published in standard, alphabetical order, the names and listings of telephone subscribers in its geographic service area. 499 U.S. at 342–44, 111 S.Ct. at 1286–87. The Court held that "there is nothing remotely creative about arranging names alphabetically in a white pages directory" and denied copyright protection to Rural's listings. *Id.* at 363, 111 S.Ct. at 1297.

■ As already stated, however, a compilation is entitled to copyright protection if its selection and arrangement of data is original. Copyright protection attaches if the following three elements are present: "(1) the collection and assembly of preexisting material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the selection, coordination, or arrangement, of an 'original' work of authorship." *Id.* at 357, 111 S.Ct. at 1293. Thus, a compilation, such as a legal directory, may be subject to copyright although the facts presented therein are not. "No matter how original the format ... the facts themselves do not become original through association.... This inevitably

means that the copyright in a factual compilation is thin." *Id.* at 349, 111 S.Ct. at 1289.

As the Second Circuit noted, however, "it is [not] anorexic." *Key Publications,* 945 F.2d at 514. Several courts pre- and post-*Feist* have found the requisite originality in various types of factual compilations. *See, e.g., CCC Information Serv., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 65–67 (2d Cir.1994) (selection and arrangement of used automobile valuation criteria are copyrightable), *cert. denied,* — U.S. —, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995); *Key Publications,* 945 F.2d at 512–14 (selection of particular businesses in specialized telephone directory for use by New York Chinese-American community is copyrightable); *Kregos v. Associated Press,* 937 F.2d 700, 703–706 (2d Cir.1991) (*Kregos I* ) (selection of nine statistics in creating baseball outcome-predictive pitching form is copyrightable); *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 204–205 (9th Cir.1989) (selection and arrangement of materials in daily organizer is copyrightable); *Eckes v. Card Prices Update,* 736 F.2d 859, 860–63 (2d Cir. 1984) (baseball card guide that selects 5000 premium cards out of total of 18,000 is copyrightable).

### 2. *Step Two: Copying Copyrightable Elements*

If a party demonstrates that its compilation is sufficiently original to be copyrightable, he must further show copyright infringement. Such copying may be shown by direct evidence of actual copying, but such evidence is rarely available. Therefore, the First Circuit has held that infringement may be established "by showing that the defendant had access to the copyrighted work and that the offending and copyrighted articles are 'substantially similar.'" *Concrete Machinery,* 843 F.2d at 606 (citations omitted). It is undisputed that MCLE had access to the Red Book.

■ Even evidence of actual copying may be insufficient, however, if this copying was not substantial. Actionable copying as a legal proposition must be shown. "The plaintiff must ... prove that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar" as a matter of law. *Lotus Development Corp.,* 49 F.3d at 813. Professor Nimmer states this distinction as follows:

> Two separate components actually underlie proof of copying. . . . First, there is the factual question whether the defendant, in creating its work, used the plaintiff's material as a model, template, or even inspiration. If the answer is 'yes,' then one can conclude that, as a factual proposition, copying took place. But the question still remains whether such copying is actionable ... [The appropriate question for actionable copying is] whether the defendant's work is substantially similar to plaintiff's work such that liability may attach.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01[B] at 13–8 to 13–9 (1995).

■ "Substantial similarity is an elusive concept, not subject to precise definition," *Concrete Machinery,* 843 F.2d at 606, but is usually governed by the "ordinary observer" test. That is, "[t]he test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* at 607 (quoting *Educational Testing Services v. Katzman,* 793 F.2d 533, 541 (3d Cir.1986)).

■ Particularly in the milieu of factual compilations, this concept is complicated by the idea/expression dichotomy or "merger doctrine" in copyright law. "The fundamental copyright principle that only the expression of an idea and not the idea itself is protectible has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." *Kregos I,* 937 F.2d at 705 (citation omitted).

■ With respect to factual works, the merger doctrine is strongly implicated because, generally speaking, there are few

ways of depicting, rendering or expressing facts. As the First Circuit explains, "[s]ome ideas admit of only a limited number of expressions. When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression." *Concrete Machinery*, 843 F.2d at 606. "This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship. As applied to a factual compilation, assuming the absence of original written expression, only the compiler's selection and arrangement may be protected; the raw facts may be copied at will." *Feist*, 499 U.S. at 350, 111 S.Ct. at 1290.

MCLE argues that Skinder–Strauss's copyright protection in the "selection and arrangement" of features is barred by the merger doctrine because the "idea" of a legal directory is indistinct from its expression. This Court disagrees. As explained further in this opinion, the record is replete with examples of legal directories, which display different combinations of features. Although there are certain core similarities among the directories, there also are sufficient differences to belie the assertion that the idea of a legal directory and its expression are inseparable.

However, the First Circuit appears to apply the concepts underlying the doctrine, as a guidepost in judging whether there is substantial similarity between the copyrighted and the infringing works. *See Concrete Machinery*, 843 F.2d at 606 (discussing merger doctrine in context of substantial similarity analysis); *accord Kregos I*, 937 F.2d at 705 ("Our Circuit has considered this so-called 'merger' doctrine in determining whether actionable infringement has occurred, rather than whether a copyright is valid, an approach the Nimmer treatise regards as the 'better view.'") (quoting 3 Nimmer, *supra*, § 13.03[B] at 13–78 to 13–79). Deciding what constitutes substantial similarity hinges on the proper application of the merger doctrine to the compilations presented here. *See Kregos I*, 937 F.2d at 705–706 (holding that every compilation presents idea that particular selection of facts presented will be useful, but proper inquiry is whether useful ideas are capable of different expressions); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930) (Learned Hand, J.) (whether merger doctrine applies depends upon level of abstraction of idea from its original expression), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); 3 Nimmer, *supra*, § 13.03[B] at 13–80 ("[A]pplication of the merger doctrine depends on the level of abstraction at which one defines the 'idea' that merges with the subject expression.") (footnotes omitted).

In other words, as idea and expression merge, "a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea." *Concrete Machinery*, 843 F.2d at 607. It further follows that "the fewer the methods of expressing an idea, the more the allegedly infringing work must resemble the copyrighted work in order to establish substantial similarity." *Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc.*, 777 F.2d 485, 491 (9th Cir.1985). "In such a case, the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." *Concrete Machinery*, 843 F.2d at 606.

The First Circuit has established a "workable, flexible framework for [this] copyright infringement analysis." *Id.* at 608. In that case, a manufacturer of animal-shaped lawn sculptures sued a competitor for infringement. Because there are a limited number of ways of portraying an animal (e.g., deer) through sculpture, the plaintiff "must show substantial similarity, between works, in those features over which it exercised discretion while portraying a 'realistic-looking concrete deer.'" *Id.* at 607.

The court must dissect the works and determine whether "there are sufficient articulable similarities to justify a finding that the defendant has copied from the protected work." *Id.* at 608. At this stage of the analysis, "[t]he court can determine, in at least a general way, those aspects of the [copyrighted] work that are protected by the copyright and that should be considered in

the subsequent comparative analysis[.]" *Id.* at 608–609.[4] Dissection follows.

## C. *Count I: Claim of Infringement by Selection of Data*

The Court will analytically dissect the works to determine whether protectible expression has been copied. In doing so, the Court will consider whether the Red Book's separate elements are sufficiently original to warrant protection under *Feist.*

### 1. *Blank Forms*

■ As an initial matter, much of the information that is contained in both volumes is subject to the "blank form" doctrine and thus is not copyrightable. Established in the landmark case of *Baker v. Selden,* 101 U.S. 99, 107, 25 L.Ed. 841 (1879) (holding "blank account-books are not the subject of copyright"), this doctrine holds that "a form that conveys no information and serves only to provide blank space for recording information contains no expression or selection of information that could possibly warrant copyright protection." *Kregos I,* 937 F.2d at 708. Accordingly, the regulations of the U.S. Copyright Office exclude from copyright protection:

> Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information.

37 C.F.R. § 202.1(c) (1995). Here, the Red Book and Blue Book both contain numerous forms for recording information, such as daily planners, cash account forms, case regis-

ters, and the like, which are not the subject of copyright protection. Even though there is evidence that MCLE "copied" some of the Red Book's blank forms, there is no infringement as a matter of law.

### 2. *Common Property*

■ Similarly, the Blue Book and the Red Book include numerous charts, lists, maps, and similar items, which contain information that is so-called "common property" and does not vary with the creativity of the compiler. For example, a standard calendar, a list of important holidays, a map of Massachusetts, a national map including time zones, and a date calculation chart are all common forms of conveying information and/or are "ideas" that cannot be considered separately from their expression. After all, there are only a very limited number of ways that an author can render a calendar, date calculation chart, or list of holidays. *Cf. Harper House,* 889 F.2d at 204, 204 n. 5 (holding that common property such as area code/time zone maps and standard calendars contained in daily organizer are not copyrightable); 37 C.F.R. § 202.1(d) (1995) (excluding from copyright "[w]orks consisting entirely of information that is common property containing no original authorship, such as, for example: Standard calendars, height and weight charts, tape measures and rulers, schedules of sporting events, and lists or tables taken from public documents and other common sources"). Therefore, the fact that certain fee schedules, holiday charts, and other similar items are common to the Red Book and the Blue Book does not establish copyright infringement.

---

4. The Ninth Circuit has developed an analogous, but somewhat more involved, test for detecting copyright infringement:

> [T]he steps we find helpful to follow are these: (1) The plaintiff must identify the source(s) of the alleged similarity between his work and the defendant's work; (2) Using analytic dissection, and, if necessary, expert testimony, the court must determine whether any of the allegedly similar features are protected by copyright.... [U]nprotectible ideas must be separated from potentially protectible expression; to that expression, the court must then apply the relevant limiting doctrines [e.g., merger doctrine, blank form, scene a faire] ...; and

> (3) Having dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to "broad" or "thin" protection. Depending upon the degree of protection, the court must set the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying.

*Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1443 (9th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995). The First Circuit's analysis, and necessarily that employed by this Court, is substantially similar.

Notwithstanding, Skinder–Strauss argues that it displayed creativity in deciding which holidays, fees, and other "common property" to include in the Red Book. For example, MCLE contends that, out of a virtually limitless supply of holidays, it selected out a small subset, which the Blue Book copies virtually verbatim. However, the Red Book and the Blue Book both list Massachusetts state holidays and the primary Jewish and Christian religious holidays. The selection criterion for such information is not determined by any creativity on the part of Skinder–Strauss and is nearly as automatic as the choice of telephone subscribers to include in a white pages. *See Feist,* 499 U.S. at 362–63, 111 S.Ct. at 1296–97. Similarly, the overlap of federal and state fee schedules in the Red Book and the Blue Book is a function of the fact that the fees are set by public authorities. The "selection" of such information does not depend on the creativity of the authors.

### 3. *Listings of Judges and Lawyers*

Included in both the Red Book and the Blue Book are comprehensive listings of federal and state judges and practicing attorneys in Massachusetts. Each volume presents different information. The Red Book lists judges alphabetically by jurisdiction and provides the name, address, and office telephone number. The Blue Book lists judges alphabetically without regard to jurisdiction and supplements the same information provided in the Red Book with a brief resume indicating the judges' career experiences.

Regarding attorney listings, both volumes list practicing Massachusetts attorneys alphabetically and geographically with minor differences. The Red Book lists the attorney's name (last name in boldface type), telephone number, firm name (if applicable), year of bar admission, address, and fax number, if applicable. Much of the information is abbreviated. The Blue Book lists the attorney's name (again last name in boldface type), firm name (if applicable), year of Massachusetts bar admission, any additional jurisdictions of which that attorney is a member, and fax number (if applicable). The Blue Book does not abbreviate, except to shorten middle names to initials. Also, the Red Book separates out Boston attorneys and lists them first among the geographic groupings of Massachusetts lawyers. In contrast, the Blue Book does not list Boston attorneys separately.

Most of the listings published in the Red Book also appear in the Blue Book. Skinder–Strauss emphasizes the fact that MCLE included in its publication certain fictitious attorney names (i.e., "seeds") that Skinder–Strauss intentionally placed in the Red Book to detect copying. It contends that MCLE pirated its exhaustive list of names, including the "seeds," and therefore is guilty of copyright infringement. MCLE exhaustively documents the process by which it developed its own database, explains away the presence of the "seeds," and argues that the Blue Book's directory is sufficiently different from that of the Red Book so as to avoid a finding of substantial similarity. In particular, MCLE demonstrates that the "vast majority of [directory] entries that Skinder–Strauss cites as common errors, involve attorneys that were in MCLE's files years before MCLE even conceived of the Bluebook." Reilly Aff. ¶ 21. Also, MCLE points out that the bar directories are not virtually identical. For example, the Blue Book contains 99 listings of lawyers whose last names begin with E, which do not appear in the Red Book.

▓ As a matter of law, it is irrelevant to a copyright analysis whether listings from the Red Book, including the "seeds," were copied verbatim into the Blue Book. "[R]aw facts may be copied at will." *Feist,* 499 U.S. at 350, 111 S.Ct. at 1290. The copyright laws do not prohibit MCLE from copying listings of attorneys included in Skinder–Strauss's Red Book. If copying true facts is permissible, it is immaterial whether MCLE copied false facts or "seeds." *See Nester's Map & Guide Corp. v. Hagstrom Map Co.,* 796 F.Supp. 729, 733 (E.D.N.Y.1992) (treating "false facts" as "actual facts" for purposes of copyright infringement). The telephone directory in *Feist* also included intentional errors to detect copying—a fact that was not relevant to the Court's analysis. 499 U.S. at 344, 109 S.Ct. at ——. If it chose to do so, MCLE could borrow freely from the Red

Book in compiling its attorney database and its Blue Book listings.

■ A more difficult question is presented with respect to the selection and arrangement of the listings in the Red Book and the Blue Book. Skinder–Strauss maintains that it exercised some creativity in selecting the names included in its Red Book. For example, not all members of the Massachusetts bar were included but only those attorneys who actively practice in one of the six New England states, excluding retired or suspended attorneys. Krivitzky Aff. ¶ 13. To the extent that MCLE simply copied substantially all of the Red Book's listings, Skinder–Strauss argues that MCLE infringed its copyright in this "original" selection of data. MCLE counters that such simple selection by geographic area is the same as selecting the telephone subscribers in a given service area for publication in a white pages directory. If so, this case is indistinguishable from *Feist,* and copyright protection is unwarranted.

Two post-*Feist* cases decided in other circuits are instructive here. In *Key Publications,* Key, a publisher of an annual classified business directory for New York City's Chinese–American community, brought an action against Galore, the publisher of a competing directory serving the same customer base. 945 F.2d at 510. Not every business in New York was included in Key's directory but only a specific subset that Key believed would be of particular interest to its clientele. Under these circumstances, the Second Circuit held that Key exercised "thought and creativity in the selection of businesses included in [its directory]" and therefore was entitled to copyright protection. *Id.* at 512.[5]

In contrast, the Eleventh Circuit found the requisite originality to be lacking in the selection of businesses to be included in a run-of-the-mill "yellow pages" directory. In *Bell-South Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.,* 999 F.2d 1436 (11th Cir.1993) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 323 (1995), Bellsouth published a yellow pages directory for the Greater Miami area, which included all of its business-rate telephone service subscribers. For purposes of its directory, Bellsouth was required to define the geographic scope of Greater Miami. A competitor used Bellsouth's yellow pages to develop its own business directory for the Greater Miami area. *Id.* at 1448–49. In Bellsouth's resulting action for copyright infringement, the court held that the geographic "selection" of listings to include in a yellow pages was devoid of originality and not copyrightable. *Id.* at 1441.

This case is closer to *BellSouth.* In compiling a Massachusetts directory of lawyers and judges, Skinder–Strauss did not exercise even a minimal degree of creativity in a *Feistian* sense in its decision to include only those Massachusetts attorneys who actively practice in New England, and to exclude retired or suspended lawyers. Judges were simply listed alphabetically and by jurisdiction.

Skinder–Strauss does not contend that it selected among practicing Massachusetts attorneys for inclusion in the Red Book on bases other than geography and active bar membership. For example, Skinder–Strauss did not select attorneys by specialty; The "selection" of other directory data, including the attorney name, address, telephone and fax numbers, year of bar admission, and so forth are equally unoriginal and determined by forces external to the compiler. Such selection of information is typical of any attempt to compile a legal directory for a certain service area. *See Mid America Title Co. v. Kirk,* 59 F.3d 719, 721 (7th Cir.) (holding that compilation of land title data not copyrightable because "title examiner was restricted by external forces to simply list [sic] all the factual information that affects the marketable title"), *cert. denied,* —— U.S. ——, 116 S.Ct. 520, 133 L.Ed.2d 428 (1995).[6]

---

**5.** Later in its opinion, however, the Second Circuit held that the Key and Galore directories were not substantially similar as a matter of law. *Key Publications,* 945 F.2d at 515–16.

**6.** Skinder–Strauss relies heavily upon a decision rendered by a panel of the Eleventh Circuit in which the court extended copyright protection to a factual compilation and limited its prior holding in *BellSouth.* This opinion, however, was recently vacated by the Eleventh Circuit and cur-

Alternatively, the merger doctrine applies here because there are so few ways of compiling listings of attorneys. This is because, by definition, any directory of lawyers for a given locale will include virtually the same information. As already explained, "similarity that inevitably stems solely from the commonality of the subject matter is not proof of unlawful copying." *Concrete Machinery*, 843 F.2d at 607 (quoting *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir.1980)); *see BellSouth*, 999 F.2d at 1442 (when only one way to produce useful business directory, merger doctrine applies and directory is uncopyrightable); *Matthew Bender & Co. v. Kluwer Law Book Publishers, Inc.*, 672 F.Supp. 107, 109–11 (S.D.N.Y. 1987) (in compiling charts displaying personal injury awards, number of ways to organize information usefully is so limited as to trigger merger doctrine). Here, application of the merger doctrine precludes a finding of substantial similarity under these circumstances.[7]

Having completed the analytic dissection, the Court holds that none of the constituent elements of the Red Book warrant copyright protection. Accordingly, summary judgment is *ALLOWED* on Count I.

### D. *Count II: The Compilation as a Whole*

As an initial matter, the Red Book as a whole is copyrightable as a compilation. Even if the compilation's elements, considered individually, are excluded from copyright, the "selection, arrangement, and coordination" of the elements in the Red Book taken as a whole may be protected. *See Harper House, Inc.*, 889 F.2d at 204 ("While many of the elements making up [daily] organizers may not be copyrightable in and of themselves, the unique 'selection, coordination, or arrangement' of such elements, in combination with copyrightable elements such as the text of the instructions, is copyrightable as a compilation.").

■ "Originality requires only that the author make the selection or arrangement independently (i.e., without copying the selection or arrangement from another work), and that it display some minimal level of creativity." *Feist*, 499 U.S. at 358, 111 S.Ct. at 1294. The combination of useful elements to include in a lawyer's reference book depends on the subjective judgment of the author as to the tastes and needs of his customers.

The difficult question is whether or not, as a matter of law, the compilation of features in the Blue Book is substantially similar to those of the Red Book. "[T]he determination of the extent of similarity that will constitute a *substantial* and hence, infringing similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." 3 Nimmer, *supra*, § 13.03[A] at 13–29 (emphasis in original).

The degree of similarity required to establish actionable copying depends upon the number of ways in which the idea behind the work can be expressed. The record presented for summary judgment displays numerous examples of legal directories, besides the works at issue here, which demonstrate that there are many ways to compose a legal directory. For example, the Connecticut Bar Association 1993 Lawyer's Diary includes a calendar, listing of courts and agencies, and listing of members of the Connecticut Bar Association, but does not include features common to the Red Book and Blue Book

---

rently is awaiting rehearing *en banc*. *See Warren Publishing, Inc. v. Microdos Data Corp.*, 52 F.3d 950, 951–54 (11th Cir.) (factual compilation listing cable systems by principal service areas sufficiently original for copyright protection), *vacated*, 67 F.3d 276 (11th Cir.1995) (en banc).

**7.** As already noted, MCLE argues that the two directories are not exactly alike by pointing to listings under the letter "E" and showing that the Blue Book has 99 listings that do not appear in the Red Book and the Red Book has 66 listings that do not appear in the Blue Book.

Reilly Aff. at ¶ 29. Skinder–Strauss argues that these differences are attributable to the fact that the 1994 Blue Book includes new members of the bar who were not admitted when the 1993 Red Book was published. By making this argument, however, Skinder–Strauss underscores the point that there is nothing original in the selection of information to include in a legal directory. MCLE did not copy Skinder–Strauss's "selection" of attorneys to include in its directory because that criterion (i.e., active bar membership) was independently determined.

such as a complete listing of practicing attorneys (as opposed to association members), tax charts, case registers, and the like. The 1994 Bar Directory of Maine includes listings of Maine lawyers, law firms, courts, and fees but excludes any blank forms such as calendars or daily planners. The 1993 Massachusetts Attorney's/Secretary's Handbook is similar to the Maine Bar Directory in that it excludes the extensive blank forms provided by the Red Book and Blue Book on which to record information.

Indeed, Skinder–Strauss provides the Court with a comprehensive listing of legal desk reference materials published nationwide to underscore the similarity between the Red Book and Blue Book. In a survey of 27 directories, Skinder–Strauss attempts to show that the Blue Book duplicates 54 of the Red Book's 66 features (e.g., alphabetical index, federal court fees, state court fees, case register, etc.). According to Skinder–Strauss, this comparison reveals an 83% duplication rate between the works. After the Blue Book, the next most similar legal directory to the Red Book shows only a 32% duplication rate. Krivitzky Aff. ¶ 12, Ex. H.

MCLE counters that Skinder–Strauss has "rigged" the comparison so as to omit several features included in the Red Book that are not found in the Blue Book and a greater number of features found in the Blue Book that are not in the Red Book. Reilly Aff. ¶ 33–37.[8] According to MCLE, these differ-ences establish that the Red Book and the Blue are not nearly or virtually identical.

At a minimum, the record establishes that there are several ways of composing a legal directory. Therefore, the Court concludes that "near identity" is not required to establish infringement by MCLE in the selection, coordination, and arrangement of Red Book elements. *See Concrete Machinery,* 843 F.2d at 607. The Court cannot conclude on summary judgment, however, whether the two works are substantially similar as a matter of law.

A determination as to whether two works are substantially similar is a mixed question of law and fact.[9] "Substantial similarity is measured by the standard of the 'ordinary reasonable person,' " *O'Neill v. Dell Publishing Co.,* 630 F.2d 685, 687 (1st Cir.1980), and summary judgment on this question is appropriate only where "the only finding that could be reached by a fact finder, correctly applying the applicable legal standard, is that there is no 'substantial similarity' between the two works." *Id.; see also Worth v. Selchow & Righter Co.,* 827 F.2d 569, 571 (9th Cir.1987) (summary judgment appropriate when "court concludes that no reasonable jury could find substantial similarity of both ideas and expression between the works at issue.") (citation omitted), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988); *Williams v. Crichton,* 860 F.Supp. 158, 164 (S.D.N.Y.1994) (district court may establish non-infringement as mat-

8. MCLE also endeavors to show that the selection of features in the Blue Book were arrived at, not through copying, but through surveys and focus groups conducted with Massachusetts attorneys. Reilly Aff. at ¶ 11–12. Notwithstanding substantial similarity between works, "a trier of fact may nonetheless find no copying if the defendant shows independent creation." *Concrete Machinery,* 843 F.2d at 606 n. 6. However, the focus group report, *see id.* at Ex. C, demonstrates that the Red Book was used as the baseline for developing the Blue Book; the focus group apparently decided which of the Red Book's features to keep and which to discard. Moreover, Skinder–Strauss has produced various MCLE internal memoranda, including one entitled "ideas to steal," that show that MCLE used the Red Book as its baseline. Krivitzky Aff.Ex. C, E. At a minimum, this evidence raises a genuine issue of material fact with respect to a possible defense of independent creation.

9. Judge Keeton styles determinations such as substantial similarity in copyright and negligence in tort as evaluative facts, which require a decisionmaker to weigh evidence to arrive at a legal conclusion. *See Massachusetts Medical Soc'y v. Dukakis,* 637 F.Supp. 684, 691 (D.Mass.1986) (Keeton, J.), *aff'd,* 815 F.2d 790 (1st Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987); Robert E. Keeton, *Judging* 56–61 (1990) (classifying and analyzing adjudicative, evaluative, and historical facts as well as proper standard employed to decide mixed questions of law and fact). Even where so-called "historical facts" (e.g., who did what, when and where, and whether with or without a defined state of mind) are undisputed, a question may remain as to the evaluative fact that serves as a prerequisite to liability. *See* Keeton, *supra,* at 57–58.

ter of law on summary judgment when "the lack of substantial similarity is so clear as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury.") (citation omitted); *Feder v. Videotrip Corp.*, 697 F.Supp. 1165, 1171 (D.Colo. 1988) ("[S]ummary judgment should not be granted if reasonable minds could differ as to the absence of substantial similarity of copyrightable material.").

This is not to say that summary judgment is never available on the question of substantial similarity, but the dissimilarity of the works at issue must be readily apparent before the Court may grant summary judgment. *See, e.g., Kregos v. Associated Press*, 3 F.3d 656, 663–64 (2d Cir.1993) (*Kregos II* ) (where only six out of ten statistics were common to two baseball outcome-predictive pitching forms, summary judgment rejecting substantial similarity proper), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Worth*, 827 F.2d at 573 n. 6 (where only 3,976 out of 12,000 factual entries in trivia encyclopedia were used to develop allegedly infringing trivia game, summary judgment finding no substantial similarity was appropriate); *O'Neill*, 630 F.2d at 687–90 (where only one theme common to what were otherwise totally dissimilar novels, no substantial similarity on summary judgment).

█ Here, the degree of similarity between the Blue Book and the Red Book is a much closer question. Certainly, there is significant overlap between the Red Book and the Blue Book, and MCLE worked from the Red Book in developing the Blue Book. Reilly Aff.Ex. C. There is also evidence that the Blue Book was developed independently from the Red Book, at least to some degree, and there are differences between them. The Court holds that there is a genuine issue of material fact on Count II with respect to whether an ordinary observer would find the selection, coordination, and arrangement of features in the Red Book and the Blue Book substantially similar so as to warrant a finding of copyright infringement. *See Costello, Erdlen & Co. v. Winslow, King, Richards & Co.*, 797 F.Supp. 1054, 1064 (D.Mass.1992) (adopted recommendation of Bowler, Mag.

J.) (denying summary judgment on substantial similarity in copyright action involving similar competing job guides).

### D. *Claim of Infringement of Derivative Work*

Count III alleges that MCLE has published a derivative work of the Red Book by publishing "as its own what amount to mere editorial revisions to portions of the plaintiff's copyrighted work (*e.g.*, plaintiff's cash account, cash register, calendar, date calculation tables)."

█ "An author holds a bundle of exclusive rights in the copyrighted work, among them the right to copy and the right to incorporate the work into derivative works." *Stewart v. Abend*, 495 U.S. 207, 220, 110 S.Ct. 1750, 1760, 109 L.Ed.2d 184 (1990). The Copyright Act of 1976 codifies the definition of a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version ... or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions ... or other modifications which, as a whole, represent an original work of authorship is a 'derivative work.'" 17 U.S.C. § 101.

Copyright in a derivative work, however, only extends to original material contributed by the author. For example, "if an author attempts to copyright a novel, e.g. about Cinderella, and the story elements are already in the public domain, the author holds a copyright in the novel, but may receive protection only for his original additions to the Cinderella story." *Stewart*, 495 U.S. at 234, 110 S.Ct. at 1767. Consequently, copyright protection in derivative works is the same as that afforded to compilations. *See* 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work...").

As this Court already has held, Red Book elements such as calendars, cash accounts, and the like, are not copyrightable, either as portions of a compilation or as derivative

works. Accordingly, summary judgment is **ALLOWED** on Count III.

### E. *Unfair and Deceptive Trade Practices*

Skinder–Strauss also alleges that MCLE violated M.G.L. c. 93A by engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L.A. c. 93A § 2. This Massachusetts state business protection statute confers standing broadly upon "any person who [engaged] in the conduct of any trade or commerce and who suffers any loss of money or property" from the unfair or deceptive trade practices of another. *Id.* at § 11.

■ Skinder–Strauss alleges that MCLE violated this statute in three ways. First, Skinder–Strauss claims that MCLE misappropriated attorney listing information, which Skinder–Strauss had previously supplied to MCLE for the sole purposes of developing a mailing list and marketing its continuing legal education materials. Skinder–Strauss alleges that MCLE used this information to develop its Blue Book and thus committed an unfair and deceptive trade practice. Second, Skinder–Strauss claims that MCLE verified the Blue Book's directory of Massachusetts lawyers by using a list of attorneys provided by the Massachusetts Board of Bar Overseers ("BBO"), which provides such information subject to the strict reservation that it not be used for commercial purposes. According to Skinder–Strauss, MCLE committed an unfair trade practice by allegedly violating BBO policies. Third, Skinder–Strauss contends that it was injured by certain false advertising in which MCLE claims that its volume was the "official" listing of Massachusetts attorneys. Such advertising, argues Skinder–Strauss,

misleads the public into believing that the Blue Book has been endorsed by the BBO or other Massachusetts authority.[10] Skinder–Strauss claims that the Red Book's sales have suffered as a result of these practices.

■ First, the allegation that MCLE misused information provided to it by agreement with Skinder–Strauss is not sufficiently supported to withstand summary judgment. The only evidence on this record to support Skinder–Strauss's allegation is an affidavit stating that MCLE used Skinder–Strauss's mailing list information to develop its own database. Krivitzky Aff. ¶ 27–28. MCLE began compiling this database in 1987, seven years before the Blue Book was published. Reilly Aff. ¶ 3. Therefore, there is no evidence that MCLE used Skinder–Strauss's information for anything other than the initial purpose of developing an independent mailing list with which MCLE could solicit customers for its continuing legal education programs.[11] In addition, MCLE independently added to its database the names of new attorneys gleaned from various sources other than the Red Book. *Id.* at ¶ 4–6. There is no evidence MCLE made any misrepresentations to obtain those listings.

Further, as this opinion already has made patently clear, MCLE was free to use the Red Book as one of the sources for compiling its Blue Book. The copyright laws do not, and constitutionally cannot, protect facts from copying. *See Feist,* 499 U.S. at 344–48, 111 S.Ct. at 1286–89. Skinder–Strauss attempts to achieve through ch. 93A what it cannot through the federal copyright laws— gaining a monopoly on the publication of certain factual information and insulating its work from competitors as a potential source of such information.

---

**10.** Skinder–Strauss also claims that MCLE violated ch. 93A by "misrepresent[ing] to the consuming public that the handbook available to them currently (i.e. by inference the [Red Book])—was not worthy of use by comparison to the [Blue Book]." Count V. This allegation may be dismissed out of hand. Whenever a competitor designs a new product and markets it, he makes an implicit claim that his product is superior to pre-existing alternatives. Such "disparagement" is part and parcel of competition and certainly not actionable under ch. 93A. *See Melo–Tone Vending, Inc. v. Sherry, Inc.,* 39 Mass.

App.Ct. 315, 319, 656 N.E.2d 312, 315 (1995) ("For competition and for the rough and tumble of the world of commerce, there is tolerance even though the fallout of that rough and tumble is damage to one of the competitors.") (internal citation omitted).

**11.** It should be noted that MCLE disputes this account and contends that it never used mailing list information obtained from Skinder–Strauss to compile its database. Reilly Aff. ¶ 40.

Objecting that use of information contained in the Red Book to develop the Blue Book is an unfair trade practice is not qualitatively different from asserting copyright protection in facts. Such protection would be contrary to the policies announced in *Feist,* and the Court declines to extend ch. 93A in this manner. Federal copyright law both preempts and forecloses this avenue of relief. *See Patricia Kennedy & Co., Inc. v. Zam-Cul Enterprises, Inc.,* 830 F.Supp. 53, 56 (D.Mass.1993) (Collings, Mag. J.) ("[S]tate law causes of action premised on theories such as misappropriation or unfair competition where the allegations are concerned solely with the copying or replication of protected works of authorship are preempted[.]"); *see also* 17 U.S.C. § 301(a)–(b) (preemption provision of Copyright Act).

█ Skinder–Strauss's second ch. 93A claim—that MCLE misused BBO registration information in violation of BBO policies—also fails because the plaintiff has not adduced sufficient evidence to present a genuine issue of material fact for trial. The BBO has adopted a "firm policy ... to deny all requests for commercial or political use of registration data." Supplemental Krivitzky Aff.Ex. A (reprinting BBO policy). To enforce this policy, the BBO requires all requests for access to contain a written acknowledgement of, and express promise to adhere to, this restriction. *Id.* MCLE obtained access to BBO registration data to verify the names included in its database and promised to limit its use of the data for that purpose. *Id.* at Ex. C (letter from MCLE production editor to BBO administrator).

After Skinder–Strauss informed the BBO of its concern that MCLE was using the registration data for a commercial purpose (i.e., preparing the Blue Book), the BBO requested that MCLE segregate all names of registered Massachusetts lawyers who appear on the BBO's list but do not appear on MCLE's original database. MCLE agreed to comply with this request to the full satis-

faction of the BBO. *Id.* at Ex. E (letter from BBO to Plaintiff's counsel); Reilly Aff. ¶ 37.

MCLE's use of BBO data, under these circumstances, did not "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149, 153 (1979). *See Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515–16 (1st Cir.1988) ("[T]he litmus test for transgression of chapter 93A involves behavior which falls within 'the penumbra of some ... established concept of unfairness,' and is sufficiently 'unethical or unscrupulous' to be actionable under the statute.") (quoting *Wasserman v. Agnastopoulos,* 22 Mass.App.Ct. 672, 497 N.E.2d 19, 23, *review denied,* 398 Mass. 1105, 499 N.E.2d 298 (1986)). If the BBO is satisfied by MCLE's corrective conduct, so is this Court.[12]

█ Skinder–Strauss's last ch. 93A claim alleges that MCLE misrepresented to the consuming public, through deceptive advertising, that the Blue Book was the "official listing of all practicing Massachusetts attorneys." Krivitzky Aff.Ex. K. Skinder–Strauss argues that MCLE falsely claimed official government endorsement. MCLE counters that its advertisement should be construed as claiming, implicitly, that the Blue Book was *MCLE* 's "official listing" and not endorsed by the BBO or other Massachusetts governmental entity. MCLE also points out that this advertisement is no longer in use and had limited circulation. The Court has examined the advertisement, which is presented on the record, and notes that nowhere does it claim to be *MCLE* 's official directory. Krivitzky Aff.Ex. K. The word "official" printed in the advertisement is not qualified in any such manner.

On this claim, Skinder–Strauss has the better argument. Regulations promulgated by the Massachusetts Attorney General to enforce ch. 93A provide explicitly that "[i]t is an unfair or deceptive act for a seller to make any material representations of fact in

12. MCLE also argues that Skinder–Strauss lacks standing to present such a claim as the true "injured" party would be the BBO itself. The Court need not resolve the standing issue in light

of the Court's conclusion that the transgression of BBO policy did not amount to an unfair trade practice.

an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading." 940 C.M.R. § 6.04(1) (1995). Furthermore, courts have confirmed that ch. 93A makes misleading or false advertising actionable by a competitor damaged by such advertising. *See Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.*, 986 F.2d 605, 605–606 (1st Cir.1993) (noting that ch. 93A action will lie for misleading advertising but finding advertising not deceptive in particular case); *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 769, 489 N.E.2d 185, 191 (1986) (noting that consumer confusion as to sponsorship or endorsement of product caused by misleading statement may be actionable under ch. 93A); *cf. Nester's Map & Guide v. Hagstrom Map Co.*, 760 F.Supp. 36, 36–37 (E.D.N.Y.1991) (using word "official" in title of taxi guide "falsely indicates that some person or entity in authority has sanctioned the publication" and constitutes a false and misleading statement in violation of the Lanham Act, 15 U.S.C. § 1125(a)).

Advertising the Blue Book as the "official listing of all practicing Massachusetts attorneys" could be misleading in that it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Kazmaier v. Wooten*, 761 F.2d 46, 51 (1st Cir.1985) (quoting *Purity Supreme, Inc. v. Attorney General*, 380 Mass. 762, 777, 407 N.E.2d 297, 301 (1980)). Even though attorneys are sophisticated consumers, MCLE's advertising might give the impression that its directory somehow carried an imprimatur of state authority. This tendency is furthered by the fact that MCLE is a non-profit corporation dedicated to bettering the Massachusetts legal community through continuing legal education. Many members of the bench, including this Court, regularly lecture at MCLE seminars or edit and contribute to MCLE materials and treatises. As a result, MCLE has acquired the patina of an entity with special status, despite its purely private legal status. Thus, the advertising statement that the Blue Book is "official" carries more weight when describing a MCLE publication than it might

when applied to another publication, such as the Red Book.

Although Skinder–Strauss has presented evidence sufficient to demonstrate that it has a valid claim under ch. 93A, it has not adduced proof of consumer confusion or of damages. An aggrieved commercial entity has standing under ch. 93A only if it has suffered "any loss of money or property[.]" M.G.L.A. ch. 93A, § 11; *see also Sierra Marketing, Inc. v. New England Wholesale Co.*, 14 Mass.App.Ct. 976, 977, 438 N.E.2d 1101, 1103 ("business" action under ch. 93A, § 11, cannot be brought for false advertising absent showing of money or property damages), *review denied*, 387 Mass. 1105, 443 N.E.2d 1322 (1982). The evidence presented here is enough to withstand MCLE's motion for summary judgment; however, the Court cannot, on this insufficiently-developed record, determine whether MCLE's false advertising has, in fact, caused injury to Skinder–Strauss.

### CONCLUSION

For the foregoing reasons, the Court *ALLOWS* MCLE's motion for summary judgment as to Counts I and III and *DENIES* its motion in all other respects. The Court *DENIES* Skinder–Strauss's cross-motion for summary judgment in its entirety. Therefore, Counts II and V are reserved for trial. Counts IV and VI are dismissed.

Attachment A:

Similarities and Differences in Red Book vs. Blue Book